UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

JOSE ARISTEDES HOLGUIN REYNOSO,

                              Petitioner,

              -v-

OSCAR AVILES, in his official capacity as Director of
Hudson County Department of Corrections;
CHRISTOPHER SHANAHAN, in his official capacity
as New York Field Office Director for U.S. Immigration
and Customs Enforcement; JEH JOHNSON, in his
official capacity as Secretary of Homeland Security;
ERIC HOLDER, in his official capacity as the Attorney
General of the United States; and the U.S.
DEPARTMENT OF HOMELAND SECURITY,

                              Respondents.

----------------------------------------------------------------------X

14 Civ. 9482 (PAE)

<u>OPINION &amp; ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/5/2015

PAUL A. ENGELMAYER, District Judge:

        Jose Aristedes Holguin Reynoso ("Holguin"), an alien, petitions for a writ of habeas

corpus, pursuant to 28 U.S.C. § 2241. Holguin is detained in prison in New York, pursuant to a

detainer issued by the Department of Homeland Security ("DHS") while proceedings to remove

him from the United States are underway. Holguin claims that he is entitled to an individualized

bond hearing to determine whether he presents a danger to the community or a risk of flight. He

argues that DHS lacked authority under the mandatory detention statute, § 236(c) of the

Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(c),[1] to detain him without such a

hearing. For the reasons that follow, the Court rejects Holguin's claim.

---

[1] The mandatory detention statute was passed by Congress as § 236(c) of the INA and is codified
at 8 U.S.C. § 1226(c). For ease of reference, the Court cites it as § 1226(c).

I.      **Background**[2]

    A.      **Holguin's Citizenship and Immigration Status**

Holguin was born in 1977 in the Dominican Republic.  Pet. ¶ 18; *id.* Ex. D.  In 2000, he married Arelis Altagracia Ventura Rodriguiz ("Ventura"), who is also from the Dominican Republic.  *Id.* ¶ 18; *id.* Ex. A.  They have one child, a son born in 2000 in New Jersey.  *Id.* ¶ 18. In 2007, Holguin entered the United States as a lawful permanent resident.  *Id.*; *id.* Ex. D.  In 2010, Ventura became a naturalized U.S. citizen.  *Id.* ¶ 18.  Since Holguin's arrival in the United States, he has lived with his wife and son in New Jersey (except when he has been in custody) and has typically maintained employment.  *Id.* ¶ 19.

    B.      **Holguin's Criminal History**

In January 2013, the U.S. Drug Enforcement Administration ("DEA") began investigating a drug trafficking organization that was distributing significant quantities of heroin in the New York City area.  Based on intercepted phone calls and physical surveillance, agents concluded that members of the organization would be preparing packages of heroin for redistribution at an apartment in the Bronx.  *See id.* Exs. E, F.

On May 13, 2013, agents entered that apartment, where they came upon an active heroin mill.  *Id.* Ex. E.  When the agents entered, Holguin and several others tried to flee via the fire escape, but were caught.  *Id.*  During the ensuing search of the apartment, agents recovered multiple packages of heroin, packaging materials, coffee grinders used to grind heroin, loose

---

[2] The Court's account of the facts is derived from the parties' submissions, including Holguin's Petition for Writ of Habeas Corpus (Dkt. 1) ("Pet.") and the exhibits attached thereto, as well as the Government's Response (Dkt. 10) ("Gov't Response").

heroin that had not yet been packaged, and glassine envelopes. *Id.* Holguin and others were arrested that day on narcotics charges. *Id.*[3]

On December 3, 2013, Holguin pled guilty to conspiracy to distribute and possess with intent to distribute heroin. On July 22, 2014, he was sentenced to time served, amounting to approximately 14 months imprisonment. *See* Gov't Response, Ex. 2; *see also United States v. Holguin*, 13 Cr. 438 (KPF), Dkt. 218. Holguin was released from custody on or about July 22, 2014, after which he remained subject to supervision by the U.S. Probation Office. *See* Dkt. 8 ("Holguin Br."), Ex. L; Pet. Ex. I; *see also* 13 Cr. 438, Dkt. 218.

### C.     The Removal Proceedings

On October 9, 2014, U.S. Immigration and Customs Enforcement ("ICE") arrested Holguin and initiated removal proceedings against him by issuing a Notice to Appear ("NTA"). Pet. ¶ 2; *id.* Ex. H.

As the basis for removal, ICE contended that Holguin was removable on two statutory grounds, both triggered by his narcotics conviction: (1) INA § 237(a)(2)(B)(i), which provides for removal following a conviction for a controlled substance violation after being admitted; and (2) INA § 237(a)(2)(A)(iii), which provides for removal following a conviction for an aggravated felony after being admitted. *Id.* Ex. H.

Significant here, ICE also determined that Holguin is subject to mandatory detention under § 1226(c), and therefore was not entitled to an individualized bond hearing. On that basis, Holguin has been detained since October 9, 2014, without such a hearing. Pet. ¶ 2. Holguin's next removal hearing is scheduled for February 13, 2015. Gov't Response, Ex. 5

---

[3] Holguin asserts that May 13, 2013 was the one and only day on which he participated in narcotics trafficking. *See* Pet. ¶ 23.

### D.      Holguin's Petition for a Writ of Habeas Corpus

On December 2, 2014, Holguin filed a petition for a writ of habeas corpus in this Court.

Dkt. 1.  His argument is that the mandatory detention statute, § 1226(c), does not apply to him,

because he was taken into ICE custody two-and-a-half months after his release from criminal

custody, whereas the statute provides for mandatory detention only for covered aliens whom

DHS detains "when . . . released" from criminal custody.  On that basis, he seeks a bond hearing.

On January 5, 2015, the parties proposed, and the Court approved, an expedited briefing

schedule.  Dkt. 4–5.  On January 8, 2015, Holguin filed a memorandum of law in support of his

petition.  Holguin Br.  On January 20, 2015, respondents filed an opposition.  Dkt. 11 ("Gov't

Br.").  On January 23, 2015, Holguin replied.  Dkt. 12 ("Holguin Reply Br.").

## II.     Jurisdiction

This Court has subject matter jurisdiction to hear Holguin's petition for a writ of habeas

corpus under 28 U.S.C. § 2241(c)(3).

The Court is not deprived of jurisdiction by 8 U.S.C. § 1226(e), which prohibits judicial

review of "[t]he Attorney General's discretionary judgment" regarding "the detention or release

of any alien or the grant, revocation, or denial of bond or parole."  That is because Holguin's

petition challenges not a discretionary decision whether to grant release, but DHS's construction

of the mandatory detention statute.  *See, e.g.*, *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 179

(S.D.N.Y. 2009)  ("While the Immigration and Nationality Act . . . precludes review of the

'Attorney General's discretionary judgment' with regard to 'detention or release of any alien or

the grant, revocation, or denial of bond or parole,' 8 U.S.C. § 1226(e), the United States Supreme

Court rejected the contention that § 1226(e) deprives courts of jurisdiction to consider challenges

to the interpretation of the mandatory detention statute.") (citing *Demore v. Kim*, 538 U.S. 510,

517 (2003)); *Monestime v. Reilly*, 704 F. Supp. 2d 453, 456 (S.D.N.Y. 2010) ("[A] district court may review challenges to removal detention based on questions of statutory interpretation or constitutional challenges to the statutory framework."); *see also Henderson v. I.N.S.*, 157 F.3d 106, 119–22 (2d Cir. 1998) (habeas review extends to statutory questions in context of removal).

## III.   Discussion

Holguin's claim turns on the proper construction of a single clause within 8 U.S.C. § 1226(c).  The Court refers to this clause, which reads "when the alien is released," as the "when released" clause.

By way of background, federal law contains two distinct provisions governing an alien's detention while removal proceedings are pending.  Section 1226(a) allows federal immigration authorities to detain an alien during removal proceedings, subject to a bond hearing.  8 U.S.C. § 1226(a).  Section 1226(c), entitled "Detention of criminal aliens," however, provides for mandatory detention of certain criminal aliens.  Immigration authorities may not provide such aliens with a bond hearing.  They may release such aliens only for limited purposes not relevant here, relating to the alien's service as a testifying or cooperating witness.  *Id.* § 1226(c)(2).

Section 1226(c)—with the "when released" clause emphasized—reads in full:

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who--

(A) is inadmissible by reason of having committed any offense covered in § 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in § 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

> (C) is deportable under § 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or
>
> (D) is inadmissible under § 1182(a)(3)(B) of this title or deportable under § 1227(a)(4)(B) of this title,
>
> *when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
>
> (2) Release
>
> The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to § 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.  A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

*Id.* (emphasis added).[4]

Holguin does not dispute that he is removable under grounds set forth in the mandatory removal statute.  Two grounds listed in § 1226(c)(1)(B) clearly apply: INA § 237(a)(2)(B)(i), which provides for removal following a conviction for a controlled substance violation after being admitted; and § 237(a)(2)(A)(iii), which provides for removal after a conviction for an aggravated felony after being admitted.  Instead, Holguin argues that the "when released" clause imposes a time limit within which DHS must act to detain such an alien after his release from criminal custody in order to lawfully forego a bond hearing.  Holguin argues that the 2.5-month

---

[4] Originally, the authority and duties imposed by § 1226(c) were those of the Attorney General; today, they belong to DHS.  *See* 6 U.S.C. §§ 202, 251, 557.

gap between his release and his DHS detention exceeded that permitted by the statute.  Pet. ¶ 28;
Holguin Br. 3–7, 9.

Although the Supreme Court and the Second Circuit have not yet considered such claims,
numerous federal courts have.  These courts have divided into two broad groups in their
constructions of whether the statutory term "when the alien is released" requires that the alien
have been detained by immigration authorities immediately upon release from criminal custody.
One group, consisting of numerous district courts, has held that this term indeed sets a time limit
within which DHS must act, and that this limit is met only where the alien is taken into custody
immediately upon release from custody (*e.g.*, pursuant to an immigration detainer filed with
prison authorities).[5]  This Court has called this interpretation the "time-limiting" construction of
§ 1226(c).  *See Straker v. Jones*, 986 F. Supp. 2d 345, 352 (S.D.N.Y. 2013).

---

[5] *See, e.g.*, *Rodriguez v. Shanahan*, No. 14 Civ. 09838 (SN) (S.D.N.Y. Jan. 30, 2015) (attached to
Holguin's Feb. 2, 2015 letter, Dkt. 13); *Cruz v. Shanahan*, No. 14 Civ. 09736 (VEC) (S.D.N.Y.
Jan. 30, 2015) (attached to Holguin's Feb. 2, 2015 letter, Dkt. 13); *Figueroa v. Aviles*, No. 14
Civ. 09360 (AT) (S.D.N.Y. Jan. 29, 2015) (attached to Holguin's Feb. 2, 2015 letter, Dkt. 13);
*Martinez-Done v. McConnell*, No. 14 Civ. 3071 (SAS), 2014 WL 5032438, at *6–8 (S.D.N.Y.
Oct. 8, 2014); *Araujo-Cortes v. Shanahan*, No. 14 Civ. 4231 (AKH), 2014 WL 3843862, at *7–8
(S.D.N.Y. Aug. 5, 2014); *Lora v. Shanahan*, 15 F. Supp. 3d 478, 487–88 (S.D.N.Y. 2014); *Jean
v. Orsino*, No. 11 Civ. 3682 (LTS) (S.D.N.Y. June 30, 2011) (oral decision); *Aparicio v. Muller*,
No. 11 Civ. 0437 (RJH) (S.D.N.Y. Apr. 7, 2011) (same); *Louisaire v. Muller*, 758 F. Supp. 2d
229, 236 (S.D.N.Y. 2010); *Monestime v. Reilly*, 704 F. Supp. 2d 453, 458 (S.D.N.Y. 2010);
*Garcia v. Shanahan*, 615 F. Supp. 2d 175, 182 (S.D.N.Y. 2009); *see also, e.g.*, *Castaneda v.
Souza*, 952 F. Supp. 2d 307, 321 (D. Mass. 2013); *Gomez-Ramirez v. Asher*, No. 13 Civ. 196
(RAJ), 2013 WL 2458756, at *3 (W.D. Wash. June 5, 2013); *Bacquera v. Longshore*, No. 13
Civ. 00543 (RM) (MEH), 2013 WL 2458756, at *4 (D. Colo. June 4, 2013); *Deluis-Morelos v.
ICE Field Office Dir.*, No. 12 Civ. 1905 (JLR), 2013 WL 1914390, at *5 (W.D. Wash. May 8,
2013); *Dighero-Castaneda v. Napolitano*, No. 12 Civ. 2367 (DAD), 2013 WL 1091230, at *7
(E.D. Cal. Mar. 15, 2013); *Bogarin-Flores v. Napolitano*, No. 12 Civ. 0399 (JAH) (WMC), 2012
WL 3283287, at *3 (S.D. Cal. Aug. 10, 2012); *Ortiz v. Holder*, No. 11 Civ. 1146 (DAK), 2012
WL 893154, at *3 (D. Utah Mar. 14, 2012); *Khodr v. Adduci*, 697 F. Supp. 2d 774, 778–79 (E.D.
Mich. 2010); *Scarlett v. U.S. Dep't of Homeland Sec.*, 632 F. Supp. 2d 214, 219 (W.D.N.Y.
2009); *Zabadi v. Chertoff*, No. 05 Civ. 03335 (WHA), 2005 WL 3157377, at *5 (N.D. Cal. Nov.
22, 2005); *Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1230 (W.D. Wash. 2004).

The other group has held that the term "when the alien is released" instead creates a pre-condition for DHS to exercise its mandatory detention authority, but does not set a temporal deadline for its use.  Two courts of appeals have adopted this view, *see Sylvain v. Attorney General of U.S.*, 714 F.3d 150, 156–61 (3d Cir. 2013); *Hosh v. Lucero*, 680 F.3d 375, 378–84 (4th Cir. 2012), as have various district courts.[6]  This Court has called this interpretation the "duty-triggering" construction of § 1226(c).  *See Straker*, 986 F. Supp. 2d at 353.

In late 2013, this Court carefully considered these competing constructions in *Straker v. Jones*, also involving a detained alien denied an individualized bond hearing.  The Court held that, although the "duty-triggering" construction of the "when released" clause was on balance the more persuasive,[7] the statute's text was not conclusive.  *Id.* at 354–56.  But, the Court noted,

---

[6] *See, e.g.*, *Romero v. Shanahan*, No. 14 Civ. 6631 (KBF), 2014 WL 6982937, at *4–5 (S.D.N.Y. Dec. 10, 2014); *Charles v. Aviles*, No. 14 Civ. 3483 (MHD), 2014 WL 3765797, at *4–6 (S.D.N.Y. July 25, 2014); *Debel v. Dubois*, No. 13 Civ. 6028 (LTS) (JLC), 2014 WL 1689042, at *4–5 (S.D.N.Y. Apr. 24, 2014); *Johnson v. Orsino*, 942 F. Supp. 2d 396, 402–07 (S.D.N.Y. 2013); *Santana v. Muller*, No. 12 Civ. 430 (PAC), 2012 WL 951768, at *4 (S.D.N.Y. Mar. 21 2012); *Guillaume v. Muller*, No. 11 Civ. 8819 (TPG), 2012 WL 383939, at *4 (S.D.N.Y. Feb. 7, 2012); *Mendoza v. Muller*, No. 11 Civ. 7857 (RJS), 2012 WL 252188, at *3 (S.D.N.Y. Jan. 25, 2012); *Gomez v. Napolitano*, No. 11 Civ. 1350 (JSR), 2011 WL 2224768, at *3 (S.D.N.Y. May 31, 2011); *Sulayao v. Shanahan*, No. 09 Civ. 7347 (PKC), 2009 WL 3003188, at *5 (S.D.N.Y. Sept. 15, 2009); *see also, e.g.*, *Pena v. Tryon*, No. 14 Civ. 282 (JTC), 2014 WL 4093567, at *3–6 (W.D.N.Y. Aug. 18, 2014); *Mora-Mendoza v. Godfrey*, No. 13 Civ. 01747 (AJB), 2014 WL 326047, at *3 (D. Or. Jan. 29, 2014); *Gutierrez v. Holder*, No. 13 Civ. 05478 (JST), 2014 WL 27059 (N.D. Cal. Jan. 2, 2014); *Cisneros v. Napolitano*, No. 13 Civ. 700 (JNE) (JJK), 2013 WL 3353939, at *1 (D. Minn. July 3, 2013) (adopting report and recommendation); *Silent v. Holder*, No. 12 Civ. 00075 (IPJ) (HGD), 2012 WL 4735574, at *2 (N.D. Ala. Sept. 27, 2012); *Espinoza-Loor v. Holder*, No. 11 Civ. 6993 (FSH), 2012 WL 2951642, at *5 (D.N.J. July 2, 2012); *Khetani v. Petty*, No. 12 Civ. 0215 (ODS), 2012 WL 1428927, at *2 (W.D. Mo. Apr. 24, 2012); *Garcia Valles v. Rawson*, No. 11 Civ. 0811 (LSA), 2011 WL 4729833, at *3 (E.D. Wis. Oct. 7, 2011).

[7] The Court also found the BIA's interpretation "more consistent with the history and purpose of the mandatory detention statute, as canvassed by the Supreme Court in *Demore*."  *Straker*, 986 F. Supp. 2d at 355; *see also id.* ("Congress adopted [§ 1226(c)] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." (quoting *Demore*, 538 U.S. at 518)); *id.* ("Congress had concluded that the INS suffered from a 'near-total inability

assuming that the term "when released" were held ambiguous, the Court was required to defer to a reasonable agency interpretation of an ambiguous statute. *Id.* (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).  And, the Board of Immigration Appeals ("BIA"), the highest immigration body charged with interpreting and implementing immigration laws, had in 2001 adopted the "duty-triggering" construction of the "when released" clause, in *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001).  *Straker*, 986 F. Supp. 2d at 352.

In *Rojas*, the BIA determined that "this statutory language impose[s] a duty on the Service to assume the custody of certain criminal aliens and specifie[s] the point in time at which that duty arises."  *Matter of Rojas*, 23 I. & N. Dec. at 121.  The BIA explained that the "when released" clause "modif[ies] the command that the Attorney General [now DHS] shall take into custody certain criminal aliens by specifying that it be done when the alien is released from criminal incarceration."  *Id.* (internal quotation marks omitted).  Under this interpretation, the "when released" clause does not place an expiration date on DHS's duty under §1226(c); if an alien who meets the requirements of §1226(c) is released from criminal custody and DHS does not immediately take him into immigration custody, DHS continues to have the duty, and therefore the authority, to take that alien into custody.  *Straker*, 986 F. Supp. 2d at 352–53.

---

to remove deportable criminal aliens,' a 'major cause' of which 'was the agency's failure to detain those aliens during their deportation proceedings.'" (quoting *Demore*, 538 U.S. at 519).

In *Straker*, this Court held that the BIA's interpretation was reasonable and warranted deference under *Chevron*. *See id.* at 356.[8] On that basis, this Court adopted the "duty-triggering" construction. *Id.*[9]

Perhaps mindful that this Court has considered and rejected the claim that § 1226(c) permits DHS to detain an alien only in cases involving immediate post-release detention, Holguin, in his brief, does not meaningfully pursue that argument. Nor does Holguin advance any new argument in support of that construction.

Instead, Holguin advances a different theory. He argues that § 1226(c) allows DHS to detain a covered alien without a bond hearing *only* where it has detained the alien within "a reasonable period" following his release from criminal custody. Holguin Br. 3–7, 9–10. Holguin makes two arguments in support of this construction. First, he argues, the text of § 1226(c) itself yields this reading. Second, and more substantially, he argues that this reading is required by the canon that a court is to avoid a statutory construction that gives rise to constitutional concerns. As to the latter point, Holguin argues that, where an alien had long been at liberty following release from criminal custody, detaining the alien based on commission of an offense listed in § 1226(c) without affording the alien a bond hearing would violate the Due Process Clause of the Fifth Amendment.

---

[8] Notably, the BIA has had the opportunity to revisit *Rojas*, including after a number of the decisions construing the statute were handed down. It has declined to do so. *See Matter of Garcia-Arreola*, 25 I. & N. Dec. 267, 268, 271 n.4 (BIA 2010).

[9] This Court, however, ultimately ruled for Straker, and directed that he be given a bond hearing, on a separate statutory ground: He had never been "released" following his conviction. Straker had been released on bail following his arrest on narcotics charges—a pretrial release which the Court held did not satisfy § 1226(c)—and had been sentenced to probation. *See id.* at 356–63.

Holguin's first argument, based solely on the text of § 1226(c), is quickly turned away.

Whatever its merits as a matter of policy, and putting to one side whether a "reasonable time"

limitation must be imputed to the statute to avoid Due Process concerns, § 1226(c)'s text simply

does not and cannot support imputing such a time limit.  Section 1226(c) does not use the word

"reasonable."  And Congress knew how to build a reasonableness limitation into a statute.  It

used the term "reasonable" in 12 other sections of the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996 ("IIRIRA")—the very statute which added the mandatory detention

provision, § 1226(c).  *See* http://www.uscis.gov/iframe/ilink/docView/PUBLAW/HTML/PUB

LAW/0-0-0-10948.html; *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In

ascertaining the plain meaning of the statute, the court must look to the particular statutory

language at issue, as well as the language and design of the statute as a whole.").  The Court's

role is to interpret a statute.  It is not to rewrite it.  *See Clark v. Martinez*, 543 U.S. 371, 378

(2005) (rejecting interpretation that "would . . . invent a statute rather than interpret one"); *In re

Trade-Mark Cases*, 100 U.S. 82, 99 (1879) ("To limit this statute in the manner now asked for

would be to make a new law, not to enforce an old one.  This is no part of our duty.") (citations

omitted).

Holguin's argument based on constitutional avoidance is more substantial.  And Holguin

is not alone in adopting this reading.  In *Castaneda v. Souza*, involving two aliens who had each

been detained for more than four years after their releases from criminal custody, a panel of the

Court of Appeals for the First Circuit recently held, based on the constitutional avoidance canon,

that, although the "when released" clause does not require a criminal alien's immediate

detention, it does require that "criminal aliens be detained within *a reasonable time* after their

release from state criminal custody."  769 F.3d 32, 44 (1st Cir. 2014) (emphasis added).  To be

sure, less than two weeks ago, following briefing in this case, the First Circuit granted the

government's petition to vacate the *Castaneda* opinion and rehear the case *en banc*. *See* Dkt. 13

(Feb. 2, 2015 letter from Holguin, reporting developments in relevant case law); *see also* 769

F.3d 32, *rehearing en banc granted, opinion withdrawn* (1st Cir. Jan 23, 2015). But, insofar as

Holguin has adopted the *Castaneda* panel's reasoning, the Court considers the analysis in that

decision for its persuasive value. *See* Dkt. 13.

  *Castaneda* derived its construction from Justice Kennedy's concurrence in *Demore*.

There, the Court, 5–4, held that § 1226(c)'s mandatory detention scheme is not facially

unconstitutional. The alien in *Demore* had been detained the day after his release from state

custody, *see Kim v. Ziglar*, 276 F.3d 523, 526 (9th Cir. 2002), and had remained in custody for

more than six months without an individualized hearing, *see Demore*, 538 U.S. at 530. He

argued that § 1226(c) violates due process because it allows DHS to detain an alien without an

individualized finding that the alien is dangerous or a flight risk. *Id.* at 514. The Supreme Court

rejected that argument. It held that aliens whose convictions fell within § 1226(c) may

constitutionally be detained "for the brief period necessary for their removal proceedings." *Id.* at

513. The Court distinguished its decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001), which had

held that aliens whose deportation is unfeasible cannot be held indefinitely; rather, in order to

justify an alien's detention for longer than six months, the government needed to show that his

removal was reasonably foreseeable. 533 U.S. at 699–700. As the Court in *Demore* explained,

"[w]hile the period of detention at issue in *Zadvydas*"—*i.e.*, after the statutory deadline for an

alien's removal had passed—"was 'indefinite' and 'potentially permanent,' the detention [under

§ 1226(c)] is of a much shorter duration." 538 U.S. 528 (quoting *Zadvydas*, 533 U.S. at 690–91).

Most removal cases, the Court noted, were completed in less than two months, and the remainder were completed, on average, in just four months more.  *Id.* at 529.

In the portions of his *Demore* concurrence cited by the *Castaneda* panel, Justice Kennedy noted that, because mandatory detention under § 1226(c) is premised on the alien's deportability, due process requires, and DHS provides, an individualized hearing to ensure that the alien is in fact deportable.  538 U.S. at 531–32 (Kennedy, J., concurring).[10]  He continued:  "For similar reasons, since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified."  *Id.* at 532.  Justice Kennedy then wrote: "*Were there to be an unreasonable delay by [ICE] in pursuing and completing deportation proceedings*, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."  *Id.* at 532–33.

Justice Kennedy's concurrence, the *Castaneda* panel stated, "suggests that 'an unreasonable delay by [ICE] in pursuing . . . deportation proceedings' could make mandatory detention under subsection (c) constitutionally suspect and requires a limiting construction."  *Castaneda*, 769 F.3d at 39 (quoting *Demore*, 538 U.S. at 532–33 (Kennedy, J. concurring)) (ellipses substituted for concurrence text by First Circuit panel).  Further, the panel stated, "[we] are left to wonder whether the petitioners' sudden arrest and detention is not 'to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other

---

[10] For this purpose, DHS holds a "*Joseph*" hearing at which the alien "may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that [ICE] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention."  *Demore*, 538 U.S. at 514 n.3; *see also In re Joseph*, 22 I. & N. Dec. 799 (BIA 1999).

reasons, which would offend due process.'"  *Id.* at 48 (quoting *Zadvydas*, 533 U.S. at 690).

Therefore:  "We think the 'when . . . released' clause must be construed as benefitting aliens

detained years after release in order to avoid constitutional doubts.  Avoidance of constitutional

doubt is a 'cardinal principle of statutory interpretation.'"  *Id.* at 46–47 (quoting *Zadvydas*, 533

U.S. at 89).

The First Circuit panel accordingly held that although § 1226(c) does not require that an

alien be taken into immigration detention immediately after release from criminal custody, *id.* at

44, it does require "that criminal aliens be detained within a reasonable time after their release

from state criminal custody."  *Id.*[11]  As to how this standard would apply in practice, the First

Circuit panel appeared to envision a case-specific inquiry:  "[W]hat is a reasonable time must

account for the inherent difficulties in identifying and locating an alien upon release from state

custody.  The statute does not tolerate unreasonable delays, but neither does it require strict

immediacy. . . .  [T]he reasonable time within which the government must detain an alien to

satisfy the 'when . . . released' clause will depend on the practical necessities at hand."  *Id.* at 44–

45.

Applying this standard, the First Circuit panel held that the period—in each case, more

than four years—between the two petitioners' releases from criminal custody and their

detentions by ICE had been unreasonably long.  It therefore affirmed the district courts'

---

[11] Supporting this conclusion, the First Circuit panel noted, was the lack of evidence that
Congress "contemplated automatic detention's being imposed years after an alien's release from
custody."  *Id.* at 43.  Congress instead, the First Circuit panel stated, had a "generalized intent to
detain criminal aliens in order to protect the community and ensure swift deportation."  *Id.*  But
where "the government has delayed several years before arresting an alien, the presumption of
dangerousness and flight risk is eroded by the years in which the alien lived peaceably in the
community."  *Id.*

decisions granting the petitions and directing that individualized bond hearings be held.  *Id.* at 49.

The First Circuit panel's analysis in *Castaneda* is not without some force.  As the panel recognized, the statute's implicit premise that *all* criminal aliens covered by § 1226(c) present dangers and/or risks of flight, requiring pre-removal detention, uneasily fits the circumstance in which the alien has lived peaceably and openly in society for years after his release from prison. 769 F.3d at 43.  One can appreciate the dislocation experienced by an alien (and his family) where removal proceedings, and the alien's mandatory statutory detention in the service of them, are abruptly initiated long after his release from criminal custody.  And, as a policy matter, the idea of holding a hearing to test whether a particular alien was a danger or flight risk where he claims to have lived an uneventful life in society long after his release from custody has understandable logic.

For three reasons, however, this Court would hesitate before adopting the First Circuit panel's conclusion that these circumstances implicate the canon of constitutional avoidance, so as to require importing into § 1226(c) the requirement that an individualized hearing be held in cases of unreasonable pre-detention delay.

First, to the extent the panel's outcome was driven by the unappealing results worked by § 1226(c)'s mandatory detention command in outlier cases like *Castaneda* involving long delays between release from criminal custody and the onset of detention,[12] case law in the area of deportation makes clear that harshness is not tantamount to a due process violation.  The nation's

---

[12]  For an even longer delay between release from criminal custody and detention, s*ee Martinez-Done v. McConnell*, No 14 Civ. 3071 (SAS), 2014 WL 5032438, at *9 (S.D.N.Y. 2014) (granting habeas corpus petition, and ordering that bond hearing be held, where alien was detained approximately 10 years after his release from criminal custody).

deportation laws, in fact, have long had categorical features denounced as unduly rigid.[13]  These
include, most obviously, the requirement of virtually mandatory deportation for the commission
of designated offenses such as aggravated felonies, *see* 8 U.S.C. § 1227 (setting out grounds for
removability); *id.* § 1229b (granting Attorney General discretion to "cancel removal" only where
removable alien meets several conditions); *Padilla v. Kentucky*, 559 U.S. 356, 363–64 (2010)
("[I]f a noncitizen has committed a removable offense after the 1996 effective date of these
amendments, his removal is practically inevitable but for the possible exercise of limited
remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens
convicted of particular classes of offenses."); *I.N.S. v. St. Cyr*, 533 U.S. 289, 297 (2001) (statute
grants Attorney General authority to cancel removal only "for a narrow class of inadmissible or
deportable aliens"), and the requirement in § 1226(c) of mandatory detention for certain
categories of criminal aliens, upheld in *Demore*.

> However, notwithstanding the capacity for categorical laws to yield "frustratingly harsh"
results in individual cases, *Debel v. Dubois*, No. 13 Civ. 6028 (LTS) (JLC), 2014 WL 1689042,
at *5 (S.D.N.Y. Apr. 24, 2014), the Supreme Court, as in *Demore*, has frequently upheld
classwide treatment of aliens in the area of deportation, including over due process challenges.[14]

---

[13] *See, e.g.*, *United States v. Dist. Dir. of Immig. & Nat.*, 222 F.2d 537, 538 (2d Cir. 1955);
*Rahman v. McElroy*, 884 F. Supp. 782, 787 (S.D.N.Y. 1995); *see also Heitland v. I.N.S.*, 551
F.2d 495, 504 (2d Cir. 1977) (Kaufman, J., dissenting) ("The majority holds that Heinz and
Hennelore Heitland, apparently outstanding members of their community and parents of a 7-year
old daughter who was born and has lived all her life in New York, may not even appeal to the
Attorney General for discretionary suspension of deportation.  It takes this rigid position because
it is of the view that the Heitlands' six-week trip to Germany in 1971–72 to visit Heinz's sick
and, as it then appeared, possibly dying sister 'meaningfully interrupted' their seven year
continuous presence in the United States.  I cannot agree that anything in the Immigration and
Nationality Act compels such a harsh result, and accordingly I dissent.") (footnote omitted).

[14] *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 295 (1993) (rejecting due process challenge, brought
by class of detained juvenile aliens, to INS policy of releasing such aliens only to their parents,

As the Court has explained, bright line rules in this area advance administrative predictability and practicality.  *See, e.g.*, *Flores*, 507 U.S. at 313 (permitting the INS to use, to a degree, "reasonable presumptions and generic rules" in setting detention policy); *see also Demore*, 538 U.S. at 528 ("[W]hen the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal."); *id.* at 551–52 (Souter, J., dissenting) (criticizing majority's holding because § 1226(c) "select[s] a class of people for confinement on a categorical basis and den[ies] members of that class any chance to dispute the necessity of putting them away").

Second, to the extent the First Circuit panel based its finding of a due process violation on Justice Kennedy's swing-vote concurrence in *Demore*, Justice Kennedy was addressing a different issue altogether.  At issue in *Demore* was the duration of immigration *detention*—not the duration of *liberty* preceding detention.  It was in that particular context that Justice Kennedy invoked concern about "arbitrary deprivations of liberty" and the possibility that a lawful permanent resident alien could become constitutionally "entitled to an individualized determination as to his risk of flight and dangerousness if *the continued detention* became unreasonable or unjustified."  538 U.S. at 532 (Kennedy, J., concurring) (emphasis added).

Justice Kennedy's concurrence did not address, let alone propose a due process test to govern, the separate issue presented by the duration of time taken by immigration authorities before apprehending a criminal alien after completion of his prison sentence.  In *Castaneda*, the

---

relatives, or legal guardians); *Carlson v. Landon*, 342 U.S. 524, 541 (1952) (upholding, against due process challenge, detention of aliens without bail in deportation proceedings where they were suspected Communists, and explaining: "As the purpose of the Internal Security Act to deport all alien Communists as a menace to the security of the United States is established by the Internal Security Act itself, Title I, § 2, we conclude that the discretion as to bail in the Attorney General was certainly broad enough to justify his detention to all these parties without bail as a menace to the public interest.").

First Circuit panel implied otherwise.  But it did so by presenting with ellipses Justice Kennedy's statement that where there was "an unreasonable delay by [ICE] in pursuing and completing deportation proceedings," 538 U.S. at 532–33 (Kennedy, J., concurring), the Due Process Clause might be implicated.  In the critical part of its decision, the First Circuit presented that statement to read, "'an unreasonable delay by [ICE] in pursuing . . . deportation proceedings.'"  *Castaneda*, 769 F.3d at 39 (quoting *Demore*, 538 U.S. at 532–33 (Kennedy, J. concurring)).  The elision is significant:  Justice Kennedy nowhere suggested that DHS's delay alone in pursuing deportation proceedings might itself violate due process.[15]  At most, his dicta referencing the "pursui[t]" of deportation proceedings can be read to suggest that the combined time taken in pursuing *and completing* deportation proceedings could give rise to a due process concern.

Third, to the extent the Due Process Clause were held implicated by the fact that time passed between a criminal alien's release from prison and the start of his pre-removal detention under § 1226(c), more focused attention would need to be given to the appropriate due process

---

[15] Had Justice Kennedy expressed that view, it is not by any means clear that his views, as the fifth vote in that case, would necessarily be "binding on us," as the First Circuit panel concluded. *Castaneda*, 769 F.3d at 39.  As noted, the issue of DHS's pre-detention delay was not presented in *Demore* nor decided there by the full Court.  Three of the four dissenting Justices took the view that a criminal alien covered by § 1226(c) is inherently entitled to an individualized bond hearing into dangerousness and flight risk.  *See Demore*, 538 U.S. at 551 (Souter, J., dissenting in part, joined by Stevens and Ginsburg, JJ.) ("Due process calls for an individual determination before someone is locked away.").  Their votes therefore are reliably counted as opposed to mandatory detention (whether or not there was pre-detention delay).  However, the fourth dissenter, Justice Breyer, took a narrower view.  He opined that an alien's right to such a hearing ought to exist only where the alien claimed that he was not deportable and where this claim was "not interposed solely for purposes of delay" and "raises a question of 'law or fact' that is not insubstantial").  *See id.* at 579 (Breyer, J., dissenting in part) (internal citations omitted).  Technically, therefore, it may be that Justice Kennedy's views would be binding on a lower court only where the conditions recited by Justice Breyer exist.  *See generally Marks v. United States*, 430 U.S. 188, 193 (1977).  In this case, notably, Holguin does not appear to challenge the underlying basis for deporting him, let alone to raise a substantial question of law or fact in such challenge.

inquiry than appears in the *Castaneda* panel's decision.  Holding that due process forbids "unreasonable delays" in initiating such detention, the panel envisioned an inquiry, apparently case-specific, into "the inherent difficulties in identifying and locating an alien upon release from state custody," "the practical necessities at hand," and the Government's basis for pursuing mandatory detention after the alien's release from criminal custody.  769 F.3d at 44–45, 47.  In the case before it, the panel put the onus on the Government to explain the delay (more than four years) in detaining the aliens and why § 1226(c)'s premise that a covered alien presents a danger and a flight risk remained valid long after his release from criminal custody.  The Government in *Castaneda* failed—it apparently did not attempt—to carry that burden.[16]

But the inquiry into "unreasonable delay," at least as envisioned by the *Castaneda* panel, is problematic, particularly if it were applied in all cases in which DHS detained a criminal alien after (as opposed to immediately upon) release from custody.  To gauge reasonableness, the First Circuit panel appeared to anticipate a threshold inquiry into the basis for DHS's decisions to detain the criminal alien at some point after his release from criminal custody and to pursue mandatory detention.  Depending on the outcome of this reasonableness inquiry, it appears, a bond hearing would, or would not, be required.  *See id.*  The panel's decision did not, however, make clear whether reasonableness would turn on objective factors (*e.g.*, the pace at and the circumstances under which DHS had worked to locate and then apprehend the alien) or on DHS's subjective state of mind (*e.g.*, whether the delay was purposeful or the product of, for example, errant communications from local law enforcement authorities), or on both.  Nor did

---

[16] The First Circuit panel stated that the Government had "offered no explanation" for the "years-long delay in bringing removal proceedings after the petitioners' release from criminal custody" or for its decision to pursue detention.  *Id.* at 47.

the panel state whether a showing of prejudice to the alien from the delayed onset of detention would be required, and if so how it would be measured, given that an alien covered by § 1226(c) had no reasonable expectation other than of immediate detention followed by removal.[17]  And the panel did not identify any threshold period of pre-detention delay (*e.g.*, six months? a year?) necessary to trigger the inquiry (presumably before a court) into whether the delay had been reasonable.

In this Court's view, if the due process clause were implicated at all by an unreasonable delay in initiating pre-removal mandatory detention, a substantial period of delay—at least six months—would be necessary to trigger a due process inquiry.  That is because, as the Supreme Court's decision in *Zadvydas* reveals, in the context of *actual* detention, six months' detention is the earliest possible point at which due process would require a hearing.  *See* 533 U.S. at 701. The Court's decision in *Demore* reinforces the point.  *See* 538 U.S. at 530–31.

---

[17] Significantly, in the criminal law context, where a claim is made of pre-indictment delay, due process is violated only where a defendant can show both substantial prejudice from the delay *and* that the delay was *intentional* on the Government's part.  *See United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) ("An indictment brought [before the applicable statute of limitations runs out] may nevertheless violate due process where pre-indictment delay has been shown to cause 'substantial prejudice' to the defendant's ability to present his defense and 'the delay was an intentional device to gain [a] tactical advantage over the accused.'") (quoting *United States v. Marion*, 404 U.S. 307, 324 (1971) ("[T]he Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.")) (footnote omitted); *see generally United States v. Valenzuela-Bernal*, 458 U.S. 858, 869 (1982) ("*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.") (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)).  The *Castaneda* panel appeared to contemplate some inquiry into DHS's intentions, insofar as it envisioned examining whether DHS's delay in pursuing and initiating detention under § 1226(c) in the service of removal was undertaken for improper reasons, *i.e.*, ones other than the legitimate one of "'facilitat[ing] deportation.'"  *Castaneda*, 769 F.3d at 48 (quoting *Zadvydas*, 533 U.S. at 690).

*Zadvydas* involved a due process challenge to detention of aliens under 8 U.S.C.
§ 1231(a)(6), which governs detention *after* an order of removal.  That provision permitted the
Attorney General to detain removable aliens for longer than the 90-day statutory removal
period—and perhaps permanently.  533 U.S. at 688–89.  Given the due process concerns raised
by indefinite (and perhaps permanent) detention, the Court read § 1231 to permit continued
detention of an alien (after the removal period) only for such time as is reasonably necessary to
secure the alien's removal.  *Id.* at 699–700.  The Court adopted a presumption that detention is
reasonable if it lasts for six months or less.  *Id.* at 701.  Where the government seeks to detain an
alien for longer than six months, however, it must show that the alien's removal is reasonably
foreseeable.  *Id.* at 699–700.

*Demore*, in turn, involved a due process challenge to the mandatory detention statute,
§ 1226(c).  The alien argued that his detention (for six months) violated due process, because
there had not been a hearing to determine if *he* was dangerous or a flight risk.  538 U.S. at 514.
The Court, however, upheld mandatory detention, "for the brief period necessary for [] removal
proceedings," for the "class of deportable aliens" that Congress specified in the statute.  *Id.* at
513, 518.  In so holding, the Court noted that, in most cases brought under § 1226(c), an alien's
detention pending removal would last an average of 47 days; in the remaining cases, in which the
alien appealed the Immigration Judge's decision to the BIA, it lasted, on average, an additional
four months.  *Id.* at 529.  In denying the alien an individualized hearing on these grounds, the
Court emphasized the particular context of pre-removal detention, noting that, "[i]n the exercise
of its broad power over naturalization and immigration, Congress regularly makes rules that
would be unacceptable if applied to citizens."  *Id.* at 521 (quoting *Mathews v. Diaz*, 426 U. S. 67,
79–80 (1976)).

In light of these precedents, it follows, *ipso facto*, that, at a minimum, a six-month delay in initiating such detention also presumptively cannot violate due process.  If neither a period of six months' actual mandatory detention pending removal proceedings (*Demore*) nor a period of six months' actual detention following issuance of an order of removal (*Zadvydas*) can form the basis of a valid due process claim, then a waiting period of six months before commencement of detention cannot violate due process either.  Indeed, the passage of such time, far from injuring the criminal alien, would arguably be a windfall for an alien who immediately upon release from custody was subject to mandatory detention in contemplation of removal.  And such a presumption makes sense.  Barring specifically pled contrary facts, the inference that such a delay in apprehending the alien was due to quotidian bureaucratic factors—which do not give rise to a credible claim of a constitutional violation—is compelling.

In light of this analysis, Holguin does not have a credible claim that the period (two and a half months) between his release from custody on his heroin conspiracy offense and the start of his mandatory detention gave rise to a due process violation.  (Holguin does not protest the duration of his detention, only the length of time that preceded it, when he was at liberty.)  And the principle of constitutional avoidance does not require imputing to § 1226(c) the right to an individualized bond hearing for persons in Holguin's circumstances.  The Court, accordingly, rejects Holguin's claim that his rights have been violated by his mandatory detention pursuant to § 1226(c).

## CONCLUSION

For the foregoing reasons, the Court denies Holguin's petition for a writ of habeas corpus.  The Clerk of Court is directed to close this case.  The dismissal is without prejudice to

the filing of a new § 2241 petition by Holguin in the event that his detention becomes
unreasonably prolonged.


          SO ORDERED.

                                              PAUL A. ENGELMAYER
                                              United States District Judge

Dated: February 5, 2015
       New York, New York